T<small>IBBS ET AL</small>., A<small>PPELLEES</small>, *v*. N<small>ATIONAL</small> H<small>OMES</small> C<small>ONSTRUCTION</small> C<small>ORPORATION</small>, A<small>PPELLANT</small>.

(No. 101—Decided March 16, 1977.)

*Messsrs. Lindhorst & Dreidame, Mr. Leo J. Breslin,* and *Mr. James D. Ruppert & Associates,* for appellees.

*Messrs. Beirne & Wirthlin, Mr. Michael A. Fulton, Messrs. Young & Jones,* and *Mr. William H. Kaufman,* for appellant.

P<small>ALMER</small>, J. Plaintiffs-appellees entered into a contract on March 13, 1972, with the defendant-appellant for the purchase of a residence lot and for the construction of a home on that lot by the defendant. In due course, the structure was built; plaintiffs took occupancy and paid the pur-

chase price of approximately $25,000. A number of serious defects in construction having become apparent, plaintiffs negotiated with agents of the defendant for the correction thereof and certain of these repairs were in fact undertaken by the defendant. The balance of problems remained unresolved, however, and on June 19, 1973, plaintiffs filed their complaint against defendant,[1] asserting multiple grounds of liability in four numbered counts: first, that defendant "negligently and carelessly, and without due regard for the rights of plaintiffs, constructed said house in a defective and unworkmanlike manner"; second, that the defects resulted from the negligent design, manufacture, inspection and/or assembly and preparation, and from the negligent inspection preparation and construction; third, that defendant breached its warranties to plaintiffs; and, finally, that defendant committed fraudulent representations. The defendant at trial conceded the existence of substantial defects in the residence constructed by it and, after both sides rested, the court instructed the jury that the defendant was liable to plaintiffs for the breach of contract and instructed them to determine compensatory damages appropriate therefor. The jury responded to this by fixing compensatory damages at $15,000, which figure was subsequently reduced by the trial court to $9,650. This aspect of the trial below is not challenged by this appeal

The trial court also submitted to the jury the issue of punitive damages claimed by plaintiffs, instructing them that if they found for the plaintiff on either of two theories, namely, on the basis of actual or constructive fraud committed by defendant against plaintiffs, or, alternately, that the failure to construct the house in a workmanlike manner was "deliberate, malicious, and evidences a willful disregard of defendant's obligation toward the plain-

---

[1] National Homes Corporation, the entity fabricating the materials constructed by the defendant, and the city of Franklin, Ohio, were named parties defendant, but were subsequently dismissed, and do not figure in this appeal.

tiffs," they might return punitive damages in favor of plaintiffs. The jury returned its verdict on this issue by finding the sum of $125,000 due plaintiffs as punitive damages. A judgment was accordingly entered and a motion for a new trial and for a judgment notwithstanding the verdict resulted in the remittitur heretofore mentioned in the amount determined for compensatory damages, but the court permitted the punitive damages to stand. The remittitur was accepted by plaintiffs and a judgment was accordingly entered awarding plaintiffs $9,650 compensatory and $125,000 punitive damages.

Defendant presents an aggregate of eleven assignments of error for review, but this unwieldly number may, we believe, be more readily dealt with by considering them in the two categories into which they seem logically to fall: first, those assignments dealing with alleged procedural deficiencies occurring during the trial and, secondly, those assignments dealing with what we deem to be the dispositive questions of general law raised by the pleadings and the evidence.

## I.

The procedural complaints of defendant are raised in its fourth, fifth, sixth, seventh, eighth, and eleventh assignments of error. In the fourth, fifth and eighth assignments, defendant raises objections to rulings of the trial court on matters which are essentially within the sound discretion of the court,[2] and in which rulings, after a careful review of the record, we are able to discover no error prejudicial to the defendant.

In the sixth assignment, the defendant asserts error in the court's refusal to permit it to show an alternate method of valuation of damages (i. e., the market value of the house had it been properly constructed as contemplated by the contract, less the reasonable market value of the house as actually delivered). Whatever merit this argument might have is unnecessary to determine inasmuch as the

---

[2]These concern discovery after the commencement of the trial and motions to declare a mistrial.

difference between the defendant's own value of $6,996 as the cost of repairs under the measure of damages given to the jury by the trial court, and its proffered evidence under its "alternate" method of valuation of damages of "between six and seven thousand dollar(s)," is so minimal that no prejudice can be apprehended in the denial of the proffered testimony by the trial court.

In the seventh and eleventh assignments of error, the appellant raises, first, the alleged failure of the trial court to charge the jury on one of the special instructions submitted by it, and, second, the alleged failure of the trial court to respond to the jury's request to be furnished with a copy of the "rules for determining punitive damages." As to the first of these, the record reflects a failure to interject a timely objection to the court's instructions as required by Civ. R. 51. Thus, the following colloquy appears:

"The Court: * * * Now, as the Court has substantially completed its instructions, does counsel for either side have any comment for the record? Mr. Ruppert?

"Mr. Ruppert: No, your Honor, I haven't.

"The Court: Mr. Kaufman?

"Mr. Kaufman: No, your Honor."

As to the second objection in this pairing of assignments of error, the jury interrupted its deliberations to make the following inquiry, as reflected in the court's comment:

"The Court: All right. I have received a note that you have given to the Bailiff with this communication: 'May we have a copy of the rules for determining fraud for punitive damages?' The answer to that question is, no, because contrary to what appearances may be, these explanations are not laid out in that kind of a concise form and it would be inappropriate for me to give you copies of any notes and so forth."

The court went on to add that it would, if the jury requested it, "reread or review for you what I have already given you, if you want me to do that," or go over any point of the instructions with which the jury might

be experiencing trouble. Since the jury had been deliberating only a few minutes, the court observed that it was. doubtful if such trouble had actually been experienced, and advised them to go back to their deliberations, and to return to him if any specific question thereafter arose. No further requests for additional instructions were received. We conclude that no error prejudicial to appellant attended this procedure.

As a consequence of our determinations, we accordingly overrule appellant's fourth, fifth, sixth, seventh, eighth and eleventh assignments of error.

## II.

We come next to consider those assignments of error, the first, second, third, ninth, and tenth, which collectively raise the more substantial questions in this appeal, and which may in turn be divided into two categories: first, those assignments of error asserting that the judgment for punitive damages was contrary to the manifest weight of the evidence and/or was the product of passion and prejudice, and, second, those assignments asserting. that, in view of the pleadings and the evidence, the issue of punitive damages should never as a matter of law have been submitted to the jury, but, having nevertheless been submitted, should have been remedied by granting the motion for a new trial or the motion for a. judgment notwithstanding the verdict. Because we have concluded that the second of these two categories raises those questions clearly .dispositive of the issues· on appeal, we have elected to proceed to the disposition of this appeal on those issues.

In thus considering those assignments of error within this second category, namely, the second, ninth ;and ·tenth, and particularly the latter two relating to the overruling. of the ·motions for a new trial and judgment n. o. v., ·we note appellant's argument, as phrased· in its first proposition under the tenth assignment of· error, that:

"Under any view of the facts of this case, conduct of the defendant's agents and the relationship of the plaintiffs and the defendant was such that no theory of liabil-

ity could support submission of the issue of punitive damages to the jury.''

If this proposition is true—and we conclude that it is—then it inescapably follows that the trial court erred in not granting to appellant a judgment notwithstanding the verdict on the issue of punitive damages.

The theory of the plaintiffs in seeking punitive damages was twofold: either fraud was committed on the plaintiffs, or, if not fraud, the defendant's failure to construct the house in a workmanlike manner grew out of a deliberate, malicious and willful disregard of its obligations to plaintiffs. As to the first of these grounds, while it is abundantly clear that a finding of fraud may sustain, under appropriate circumstances, a determination of punitive damages,[3] we are unable to discover within the record of this cause credible evidence in support of at least one essential element of fraud.

It is generally true that fraud cannot be predicated upon promises or representations relating to future actions or conduct:

''Representations as to what will be performed or will take place in the future are regarded as predictions and are not fraudulent, irrespective of whether the matter is before the court as an action for the deceit or defensively as a ground of avoidance of a written contract. A false assertion presupposes that an event has occurred, that a duty has been performed, that a fact has intervened or that an authority exists, either or all of which may have reduced the contract or prevented its being consummated.'' 24 Ohio Jurisprudence 2d 646, 647, Fraud and Deceit, Section 38.

As representative applications of this principle, see *Schuster Electric Co.* v. *Hamilton County Stores* (1939), 61 Ohio App. 331; the dissenting opinion of Judge Matthews, in *Alms & Doepke* v. *Young* (1935), 20 Ohio Law Abs. 325; *Glass* v. *O'Toole* (1930), 36 Ohio App. 450; and *Coral*

[3]See, generally, 16 Ohio Jurisprudence 2d 178, Damages, Section 156; annotation, 165 A. L. R. 614.

*Gables, Inc.* v. *Schmieding,* 36 Ohio Law Abs. 327. Sometimes referred to as an exception to this rule—although in reality simply an application of the rule to extended facts—is the instance of the malefactor who makes his promise of future action, occurrence, or conduct, and who *at the time he makes it,* has no intention of keeping his promise. In such case, the requisite misrepresentation of an existing fact is said to be found in the lie as to his existing mental attitude and present intent. See, for example, *Dozier* v. *Keller* (1944), 73 Ohio App. 321, where the defendant represented that he would hold the plaintiff's money until it was learned if others would subsequently contribute to a common venture. In fact, he did not hold the money but promptly appropriated it to his own uses. Said the court:

"Of course, a fraudulent representation must be of an existing fact in order to justify an action in tort for damages sustained by reason of an acting upon such representation.

"However, the mental attitude and the then intent of the one who makes the representation are existing facts and the only difficulty is one of proof. * * *

"Here there is proof of existing facts, to wit, the mental attitude and the intent of Keller not to keep his agreement, and the falsity of his promise." *Id.* at 321-22.

Other examples of extensions of the general rule, *supra,* might be cited, as where the representations as to future events deal with matters which depend for their occurrence upon the acts of the party making them (Restatement of Torts, Section 530 [1938]) and especially where the refusal to act upon the promise is "willful and wrongful." *Monaghan* v. *Rietzke* (1949), 85 Ohio App. 497.

The immediate question, then, is whether the evidence in the matter *sub judice* presented a question of fact for the jury under any such theory of fraud cognizable in this state. A review of the record reveals a reliance by plaintiffs upon the representations of agents of the defendant corporation "that their product was of high quality material and construction, when said material [was] of poor quality and is substandard." Assuming *arguendo* that

the corporation was bound by the representations of its sales personnel to plaintiffs, the representations in question appeared to consist of statements that the defendant was "either the largest or one of the largest home builders in the country," that when plaintiffs expressed concern over various materials to be incorporated into the structure, the salesman assured them that of the high quality products, "they used only the very best," and that defendant's "engineers were trained to design a house to any specifications and that he could forsee no problem because this was their job, and they were the best." Elsewhere, defendant's agents were said to have assured plaintiffs that "they had the very best engineers and used the very best products," and would use "the very highest quality" of materials and workmanship.

Plaintiffs admitted that no specific representations as to the quality of the lumber used in the house were made to them, and, in point of fact, No. 2 grade lumber was used in whole or in large part, this being the second highest of 4 grades of construction lumber and the grade generally used in the construction of homes within the modest price class contracted by the plaintiffs, and otherwise in conformity with the requirements of the applicable building code. One of plaintiffs' witnesses described the materials as "not consistent," but another of plaintiffs' witnesses testified that if certain structural repairs having little or nothing to do with the original quality of materials were made "this home will be in an excellent state of repair."

We conclude from the foregoing and other relevant portions of the transcript, that plaintiffs did not adduce sufficient credible evidence of fraud to have justified the court in submitting this theory, for punitive damages, to the jury. Clearly, there was no misrepresentation of an existing fact or circumstance as to materials, since they were not in existence at the time, and we are not able to conclude that the evidence furnished any basis for inferring a misrepresentation of the then state of the agents' minds when they represented that the goods would be of the "highest quality." Indeed, the matter assumes, with re-

spect to the quality of lumber (which was the only signi-
ficant alleged deficiency in *materials* argued by plaintiffs),
the aspect of "puffing" rather than actionable fraud.
*Wilchins* v. *Pool* (1971), 29 Ohio App. 2d 223.

Moreover, as to the additional requisite element of
*reliance* on the arguable misrepresentation, it is difficult to
conceive that the plaintiffs could have understood it in
any way other than a representation that the materials
would be of the highest quality for *comparable* housing.
No one has a right to expect sandalwood and teak to be in-
corporated into a $25,000 house, unless, that is, he is ex-
pressly told that such materials will be used. We find little
evidence that the quality of materials was not of an antic-
ipatable standard for comparable housing, and certainly
no evidence that any arguable deficiency in such quality
was the product of fraudulent intent.

The case with respect to *workmanship* is, however, on
another footing entirely. Whatever one may say in expia-
tion of the materials furnished for the home, the work-
manship in utilizing the materials was concededly bad. To
consider the structural defects alone, the steel beam sup-
porting the first floor was so misaligned that many joists
bore on less than one inch of their surface. The displace-
ment of one joist would cause a "domino effect" on the
others, and a possible collapse of the house. The floors
swayed, nails popped out of wall boards because of stress,
and other untoward symptoms manifested themselves
shortly after the plaintiffs occupied the premises. While
the foregoing catalogue of construction ills is clearly as
insufficient as the alleged deficiencies in materials to sus-
tain fraud, since the workmanship was no more in exis-
tence at the time of the representations than the materials,
and since there is not a shred of evidence to convict the
sales personnel of any present knowledge, intent, or com-
mand that such would be the state of affairs when construc-
tion commenced, nevertheless, the issue of workmanship

---

[4]*Schubert* v. *Neyer* (1959), 12 Ohio Op. 2d 231, 165 N. E. 2d 226;
*Public Finance Corp.* v. *Callopy* (1959), 82 Ohio Law Abs. 65, 164 N.
E. 2d 205.

becomes relevant in considering the second of the plaintiffs' theories to justify the award of punitive damages, namely, whether or not the elements of fraud existed, the failure to construct the house in a workmanlike manner was occasioned by a deliberate, malicious and willful disregard of the defendant's obligations toward plaintiffs, and such malice may lawfully and appropriately be punished by the award of punitive damages.

It is true, as plaintiffs argue, that in a proper case actual malice (a state of mind in which conduct toward another is characterized by hatred, ill will, a spirit of revenge or retaliation, or implied malice—i. e., malice implied from wrongful acts purposely done without reason or excuse to the injury of another) may support an award of punitive damages. 16 Ohio Jurisprudence 2d 184, Damages, Section 161. The question, however, is whether the case presented by plaintiffs is such a proper case.

We take it to be settled law in this jurisdiction that punitive damages are not appropriate to and may not be awarded in actions *ex contractu.* Declarative of this rule are the decisions of the Supreme Court of Ohio beginning with *Ketcham* v. *Miller* (1922), 104 Ohio St. 372, where paragraph two of the syllabus states:

"Punitive damages are not recoverable in an action for breach of contract."

The *Ketcham* case is also notable for the rule, expressed in the first paragraph of the syllabus, that the pleader does not alter what is essentially an action for breach of contract by adding that the breach was unlawfully, willfully, wantonly, or maliciously done.

The court also stated: "While the facts of this case might well have justified a pleading charging a tort, we are unable from the amended petition itself to reach any other conclusion than that the gravamen of the complaint is the breach of the contract, and that the words "willfully, wantonly, maliciously" add nothing thereto and must have been intended by the pleader to characterize the motive and purpose of the perpetrator of the breach." *Id.,* at 377.

Following the *Ketcham* case and to the same effect

were *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414, and *Davis* v. *Tunison* (1959), 168 Ohio St. 471. Other Ohio authorities standing for the proposition that punitive damages are not available in actions for breach of contract include *Schell* v. *Kaiser-Frazer Sales Corp.* (1971), 28 Ohio App. 2d 16, and *Refrigeration & Air Conditioning Inst.* v. *Rine* (1946), 75 N. E. 2d 473. A recent decision of the United States Court of Appeals in *Battista* v. *Lebanon Trotting Assn.* (C. A. 6, 1976), 538 F. 2d 111, restates the above Ohio rule, distinguishing the cases of *Kirk* v. *Safeco Ins. Co.* (1970), 28 Ohio Misc. 44, relied upon by plaintiffs, and *Sweet* v. *Grange Mut. Cas. Co.*, unreported, Court of Appeals for the Seventh District No. 607, decided June 30, 1975, both of which involved an insurer which willfully and wrongfully refused to pay a valid claim, a violation of a special duty requiring a "special consideration" not relevant to ordinary contracts. In a similar vein are *Craig* v. *Spitzer Motors* (1959), 109 Ohio App. 376, and *Armstrong* v. *Feldhaus* (1950), 87 Ohio App. 75, which although praying relief for breach of contract, contain *separate distinct claims of tort damage,* namely, fraud and conversion, respectively, for which an award of punitive damages was appropriate.

What then may be said of the instant case; does it sound in tort, or is it an action for breach of contract? As established earlier, the interjection here of fraud as a separate cause was abortive and should not have been submitted to the jury. This is not, then, the *Craig* case. Further, we have learned from *Ketcham* v. *Miller, supra,* that simply characterizing an action as one "willfully, wantonly, and maliciously" done adds nothing new to a cause essentially directed to securing relief for a breach of contract.

What we are left with in the instant matter, then, are the first three counts of the complaint, less the pejorative adjectives. These counts allege, respectively, an execution of a contact to construct a house, with the construction performed in a "defective and unworkmanlike manner," resulting in damage to plaintiffs (first count), a

breach of warranty (third count), and its negligent design, manufacture, inspection, assembly, and construction (second count). Since no credible evidence accompanied it, the second count was properly not submitted to the jury by the trial court, who instead instructed the jury that the defendant had, as a matter of law, committed a breach of contract for which they were instructed to determine compensatory damages. We conclude that the complaint, stripped of its surplusage, sounds in contract, and in this respect we find ourselves in agreement with our brothers on the Court of Appeals for Franklin County in *Lloyd* v. *William Fannin Bldrs.* (1973), 40 Ohio App. 2d 507, where, in a fact situation otherwise indistinguishable from the instant case, the court held the action for damages a failure "to complete the building in a workmanlike manner" to be *ex contractu* and therefore not governed by the four year statute of limitations dealing with actions *ex delicto.*

The Court there stated: "In other words, we hold that the duty imposed on a builder-vender to build structures in a workmanlike manner arises out of an implied bargain, an implied provision, an implied condition, or an implied term of the sale; whatever the name which is attached to such duty, it is a duty which is implied in law and comes from the contract between the builder-vendor of the real-property structure and the vendee." *Id.,* at 510.

This determination accords with what we understand to be the essential rule of *Mitchem* v. *Johnson* (1966), 7 Ohio St. 2d 66, where, despite the occasional use of language more customarily associated with tort actions, the Supreme Court held that the recovery of damages for the breach of a warranty by a builder of a real-property structure does not depend on his negligence (paragraph one of the syllabus), but arises from a duty imposed by law to construct the building in that workmanlike manner and with that care and skill in the choice of materials and work as will equate with the gravity of the risk involved in protecting the structure against faults and hazards

(paragraph three of the syllabus). That this "duty imposed by law" grows out of the bargain struck between buyer and seller, that is, that it arises *ex contractu,* is clearly implied in the following extract from the *Mitchem* decision:

"* * * On the other hand, we do concur in the statement that *it is an implied term of the sale* that the builder will complete the house *in such* a way that the work (both before and after the sale) would be done in a workmanlike manner. Thus, the defendant should be entitled to show, and to have the triers of the facts consider in assessing fault, that he employed proper materials and workmanlike skill and judgment in constructing the house, taking into consideration the hazards of the lot and area and the risk of harm to the structure from those hazards." *Id.,* at 73. (Emphasis added.)

This conclusion requires us to overrule the decision reached by our brothers, sitting by designation, in Hamilton County in *Benson* v. *Dorger* (1972), 33 Ohio App. 2d 110, and we do so herewith.

It follows, then, from our conclusion that the instant action, stripped of its unproven allegations of fraud, is one *ex contractu* for damages resulting from the breach of a contractually assumed duty to construct in a workmanlike manner commensurate with the hazards of the lot and area, that the law of this jurisdiction limits recovery to compensatory damages and does not permit the consideration and award of punitive damages. The trial court erred, therefore, in submitting the issue to the jury, and, in terms of defendant's tenth assignment of error, erred to the prejudice of defendant in overruling defendant's motion for a judgment notwithstanding the verdict, as to the issue of punitive or exemplary damages.

While this determination, which is dispositive of the central issue raised in this appeal with respect to the appropriateness of the judgment of punitive damages, moots other questions raised by defendant—most notably a difficult and unrewarding examination into whether the judg-

ment was the product of passion and prejudice—we are constrained to note our reservations as to two other aspects of this case.

First, if an award of punitive damages rests on a foundation of *malice,* as it must without a count of fraud to sustain it, then the charge of malice must be sustained by evidence of actual or express malice, as opposed to what is termed "legal malice." In *Pickle* v. *Swinehart* (1960), 170 Ohio St. 441, 443, the Supreme Court held:

"Actual or express malice has been defined as that state of mind under which a person's conduct is characterized by hatred or ill will, a spirit of revenge, retaliation, or a determination to vent his feelings upon other persons. Legal or implied malice, on the other hand, is that which the law infers from or imputes to certain acts, and has been defined as that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.

"Hence it is clear that a request for simply a charge on legal malice is by no means a request for a charge on actual malice. The plaintiff made no request for a charge on actual malice, *an element which this court has held to be essential to the allowance of punitive damages* (see *Davis* v. *Tunison,* 168 Ohio St. 471, 155 N. E. (2d), 904), and the Court of Appeals was in error in reversing the trial court for not so charging." (Emphasis added.)

It is true, as later stated in *Columbus Finance,* v. *Howard* (1975), 42 Ohio St. 2d 178, that the requisite actual or express malice to sustain punitive damages may be drawn from circumstances and need not be proved by direct utterances or verbal acts. Thus, the court noted:

"Appellants assert in their sole proposition of law that intentional, reckless, wanton, wilful and gross acts which cause injury to person or property may be sufficient to evidence that degree of malice required to support an award of punitive damages in tort actions. This broad statement is also correct; actual malice may be inferred from conduct and surrounding circumstances. *Davis* v. *Tunison, supra.* However, this court concurs in the con-

clusion of the Court of Appeals that the record in this case contains absolutely no evidence from which actual malice upon the part of Columbus Finance can be inferred. Therefore, the Court of Appeals correctly reversed the trial court's award of punitive damages and attorney fees." *Id.,* at 184.

As in the *Columbus Finance* case, we are unable to find in this record credible evidence of malice of either variety, actual malice or malice inferred from conduct. Indeed, we note that plaintiffs' own witness testified that the defendant had voluntarily corrected some construction defects, and had offered to correct the major structural defects, but was rebuffed by the plaintiffs from discussing or effecting them. Certain of these repairs and offers to repair were confirmed by the plaintiffs who were, however, by this time in no mood to indulge defendant's workmen, and perhaps understandably so. But whatever the justification for plaintiffs' irritation with defendant's construction habits, we find no evidence in the record from which the jury could have inferred the degree of malice necessary under Ohio law to sustain an award of punitive damages.

Finally, we note that any inferred malice which might arguably have attached to the construction of this home would indisputably have been that of the defendant's agents. We take the Ohio rule to be as expressed in *Tracy v. The Athens & Pomeroy Coal & Land Co.* (1926), 115 Ohio St. 298, 302-03, where the court observed:

"Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer, but by way of punishment to the offender, and as a warning to others, can only be awarded against one who has participated in the offense. A principal, therefore, though, of course, liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages merely by reason of wanton, oppressive, or malicious intent on the part of the agent. In other words, where that which is tantamount to punitive or exemplary damages is to be recovered by reason of

the willful character of the wrongful act, proof of this knowledge and willfulness on the part of the party producing the wrong must be made. The employer cannot be punished for the personal guilt of his servant or agent, unless the employer authorized, ratified, or participated in the wrongdoing. 5 Fletcher on Corporations, Section 3354; Mechem on Agency, Section 2013, 2014, 2015; *L. S. & M. S. Ry.* v. *Prentice,* 147 U. S., 101, 13 S. Ct. 261, 37 L. Ed. 97.''

The above rule has been followed and applied in two cases from this district, *Fitscher* v. *Rollman & Sons Co.* (1929), 31 Ohio App. 340, and *Stock Yards Bank* v. *Seal* (1927), 27 Ohio App. 179, and elsewhere in *Levin* v. *Nielsen* (1973), 37 Ohio App. 2d 29. Where the master *ratifies* the fraud or malice of his agent, as in *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414, the rule is otherwise, but we can find no such evidence of ratification by the defendant corporation here even if we were to assume malicious acts of construction by the defendant's agents occurred.

It follows from what we have concluded above that two additional reasons are apparent in this record as to why the issue of punitive damages should not have been submitted to the jury, apart from the basic rule recited *supra,* with respect to the unavailability of such damages in breach of contract actions: the absence of evidence from which the jury could have found or inferred the requisite malice, and the absence of evidence of the direction of or ratification by the corporation of its agents' objectionable acts. Therefore, we find the defendant's ninth and tenth assignments of error to be well taken, inasmuch as the trial court erred in not granting, as to the issue of punitive damages only, a judgment in favor of defendant notwithstanding the verdict.

The balance of defendant's assignments of error not heretofore ruled upon, being subsumed in or mooted by these conclusions, are overruled.

It is therefore the order of this court that the judgment of the trial court be modified by granting a judgment notwithstanding the verdict to the appellant as to punitive

damages; in all other respects, the judgment of the trial court is affirmed.

*Judgment affirmed in part and reversed in part.*

Shannon, P. J., and Keefe, J., concur.

Keefe, J., concurring. I find myself in general agreement with my brothers in the conclusion which they reach in this case. The author of the opinion sagely ascertains that the theory of the plaintiffs in seeking punitive damages was twofold: either because fraud was committed on the plaintiffs or, if not fraud, then punitive damages were justified because of the defendant's failure to construct the subject house in a workmanlike manner and such failure flowed from a deliberate, malicious and willful disregard of defendant's obligations to plaintiffs. As to the first of the grounds for possible entitlement to punitive damages, there was insufficient evidence of fraud to have justified the court in submitting the subject of punitive damages to the jury on a fraud theory. However, in examining the complaint in the instant action, I cannot reach the same conclusion as my brothers in concluding that the action *subjudice* is *ex contractu* and that recovery therefore is limited to compensatory damages and would not permit the consideration and award of punitive damages. I view the complaint as alleging acts constituting a breach of contract by the defendant, but also amounting to a cause of action in tort, thus justifying a recovery of exemplary damages on proper proof. I am favorably affected by the following text in 25 Corpus Juris Secundum 1126, 1128, Damages, Section 120:

"* * * [E]xemplary damages are recoverable for a tort committed in connection with, but independently of, the breach of contract, where the essentials of an award of such damages are otherwise present, the allowance of such damages being for the tort and not for the breach of contract. In order to permit a recovery, however, the breach must be attended by some intentional wrong, insult, abuse,

298

or gross negligence which amounts to an independent tort."

The Corpus Juris Secundum quotation notes *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414, the second paragraph of the syllabus of which holds:

"In an action to recover damages for a tort which involves the ingredients of fraud, *malice* or insult, a jury may go beyond the rule of mere compensation to the party aggrieved and award exemplary or punitive damages. (*Roberts* v. *Mason*, 10 Ohio St., 277, approved and followed.)" (Emphasis supplied.)

Although differing from my brothers in their evaluation of the instant action as one sounding exclusively in contract, while I believe the complaint also amounts to a cause of action in tort, the full court arrives at the same end result because of the failure of the plaintiffs to prove actual malice, even though it may be inferred in this state from conduct and surrounding circumstances.

Therefore, I concur with the determination that the judgment of the trial court be modified by granting a judgment notwithstandinging the verdict to the appellant as to punitive damages; otherwise, the judgment of the trial court should stand.